IN THE SUPREME COURT OF NORTH CAROLINA

No. 11A20

Filed 11 December 2020

IN THE MATTER OF: B.E., J.E.

Appeal pursuant to N.C.G.S. § 7B-1001(a1)(1) from orders entered on 24 September 2019 and 25 October 2019 by Judge William F. Helms III in District Court, Union County. This matter was calendared in the Supreme Court on 23 November 2020 but determined on the record and briefs without oral argument pursuant to Rule 30(f) of the North Carolina Rules of Appellate Procedure.

*Perry, Bundy, Plyler & Long, LLP, by Ashley J. McBride, for petitioner-appellee Union County Division of Social Services.*

*Winston & Strawn LLP, by John H. Cobb, for appellee Guardian ad Litem.*

*Sydney Batch for respondent-appellant mother.*

*Jeffrey William Gillette for respondent-appellant father.*

BEASLEY, Chief Justice.

Respondent-mother and respondent-father appeal from the trial court's orders terminating their parental rights in the minor children "Justin"[1] and "Billy." We affirm.

---

[1] Pseudonyms are used throughout the opinion to protect the juveniles' identity and for ease of reading. A third child will be referred to by the pseudonym "Chaz."

I. <u>Procedural History</u>

Respondents have three children together: Justin, born in 2006; Billy, born in 2004; and Chaz, born in 2003. In November 2016, the Union County Division of Social Services (DSS) obtained nonsecure custody of respondents' children and filed juvenile petitions alleging they were neglected and dependent. The petitions cited a Child Protective Services (CPS) report received on 29 September 2016 stating that Chaz came to school with a "busted lip" and said respondent-father had "backhanded him in the face and repeatedly hit him in the head with a fist" while intoxicated. The report indicated respondent-father regularly drank alcohol and became angry. It also described respondents' children as frequently hungry due to the "minimal food" in the home and described the home as rat-infested and unkempt.

DSS's petitions further alleged that respondent-father admitted striking Chaz and agreed to refrain from physical discipline as part of a safety agreement. However, respondent-father refused to obtain a substance abuse assessment and failed to attend an assessment scheduled for 28 October 2016. After a social worker met with respondents, respondent-father participated in a substance abuse assessment on 3 November 2016 but refused to engage in the recommended treatment to address "his intensive history of abusing alcohol."

Finally, the petitions alleged DSS received another CPS report of respondent-father repeatedly striking Chaz on the head and knocking him to the ground while drinking alcohol on 7 November 2016. When a social worker met with respondents

about the report, respondent-father refused to enter into a safety agreement to refrain from physical discipline, abstain from alcohol, or participate in substance abuse treatment. Respondents told DSS that they had no family support or alternative placement options for the children.

Upon the parties' stipulation to facts consistent with the petitions' allegations, the trial court adjudicated respondents' children neglected and dependent juveniles on 7 February 2017. The court maintained the children in DSS custody and ordered respondent-father to abstain from alcohol, attend Alcoholics Anonymous, engage in substance abuse treatment through Daymark Recovery, attend parenting classes, complete the activities in his Out of Home Services Agreement with DSS, maintain a residence separate from respondent-mother, and submit to random alcohol screens. Respondent-mother was ordered to attend parenting classes, complete the activities in her Out of Home Services Agreement, and obtain a psychological and mental health evaluation and comply with any treatment recommendations. The court forbade both respondents to discuss the case with the children "at any time."

While awaiting an appropriate therapeutic placement for Chaz, the trial court authorized a trial home placement for the child with respondent-mother beginning in March 2017. At the initial review hearing on 3 May 2017, however, the court ordered Chaz removed from respondent-mother's home and returned to foster care. In its review order, the trial court found respondent-mother "was unable to get [Chaz] to the [school] bus on time" and had failed to administer the child's medication properly

despite "multiple instructions" and DSS's provision of "medication bags . . . with the correct amount of medication she needed to administer the medication each night." The court further found that, despite receiving food stamps and additional financial assistance, respondent-mother "cannot keep food in the home" and "has demonstrated an inability to manage her finances" to the detriment of the children; that respondent-mother's home "is in poor condition," infested with insects and rodents, and strewn with trash and soiled clothing; that "the clothing in [Chaz's] bedroom had dog feces mixed within it"; and that respondent-mother "sends [Chaz] to school in clothes that are dirty and too small for him." Although respondent-mother had completed a series of parenting classes, the court found she continued to make inappropriate promises and other statements about the case to the children and had otherwise failed to show "she is able to put what she has learned into effect."

With regard to respondent-father, the trial court found that he continued to drink alcohol, that he smelled of alcohol at his visits with the children, and that he had informed DSS "he would cut back on drinking but would never quit completely" but "the changes he would be making would be temporary only because of DSS involvement."

At the initial permanency planning hearing held 21 March 2018, the trial court concluded that further DSS efforts to reunify the children with respondents "clearly would be futile, unsuccessful and inconsistent with the [children's] health and safety and need for a safe, permanent home within a reasonable period of time." The court

established a primary permanent plan of adoption for the children with a secondary plan of custody or guardianship with an approved caretaker.

DSS filed a motion for termination of respondents' parental rights on 14 May 2018. After a series of continuances, the trial court held an adjudicatory hearing beginning on 27 February 2019, proceeding over four dates, and concluding on 8 May 2018. On 24 September 2019, the court entered an order adjudicating the existence of grounds to terminate respondents' parental rights for (1) neglect, (2) willful failure to make reasonable progress to correct the conditions that led to the children's removal from the home, and (3) dependency.

The trial court held a dispositional hearing on 27 September 2019. In an order entered on 25 October 2019, the court concluded that terminating respondents' parental rights was in the best interests of Justin and Billy but not in the best interests of Chaz. The court terminated respondents' parental rights in Justin and Billy and dismissed DSS's motion as to Chaz. *See* N.C.G.S. § 7B-1110(a)–(b) (2019).

Respondents each filed timely notice of appeal pursuant to N.C.G.S. § 7B-1001(a1) (2019). We consider their appeals in turn.

## II. Respondent-Mother's Appeal

Respondent-mother claims the trial court erred in concluding that grounds exist to terminate her parental rights pursuant to N.C.G.S. § 7B-1111(a)(1)–(2) and (6). "We review a trial court's adjudication under N.C.G.S. § 7B-1109 'to determine whether the findings are supported by clear, cogent and convincing evidence and the

findings support the conclusions of law.' The trial court's conclusions of law are reviewable de novo on appeal." *In re A.L.S.*, 374 N.C. 515, 519 (2020) (quoting *In re C.B.C.*, 373 N.C. 16, 19 (2019)). We have held that "an adjudication of any single ground in N.C.G.S. § 7B-1111(a) is sufficient to support a termination of parental rights." *In re E.H.P.*, 372 N.C. 388, 395 (2019). Therefore, if we determine that one of the trial court's adjudicated grounds for termination is supported by the findings of fact and conclusions of law, we need not review the remaining grounds. *Id.*

The trial court concluded, *inter alia*, that respondent-mother had neglected the children under N.C.G.S. § 7B-1111(a)(1). A juvenile is "neglected" within the meaning of our Juvenile Code if he does not receive "proper care, supervision, or discipline" from his parents or "lives in an environment injurious to [his] welfare." N.C.G.S. § 7B-101(15) (2019). "In order to constitute actionable neglect, the conditions at issue must result in 'some physical, mental, or emotional impairment of the juvenile or a substantial risk of such impairment.'" *In re K.L.T.*, 374 N.C. 826, 831 (2020) (quoting *In re Stumbo*, 357 N.C. 279, 283 (2003)).

For purposes of N.C.G.S. § 7B-1111(a)(1),

> "the dispositive question is the fitness of the parent to care for the child 'at the time of the termination proceeding.'" In the event that "a child has not been in the custody of the parent for a significant period of time prior to the termination hearing, 'requiring the petitioner in such circumstances to show that the child is currently neglected by the parent would make termination of parental rights impossible.'" In such circumstances, the trial court may find that a parent's parental rights in a child are subject to

termination on the grounds of neglect in the event that the petitioner makes "a showing of past neglect and a likelihood of future neglect by the parent."

*In re S.D.*, 374 N.C. 67, 73 (2020) (quoting *In re N.D.A.*, 373 N.C. 71, 80 (2019)).

In support of its adjudication under N.C.G.S. § 7B-1111(a)(1), the trial court recounted the conditions leading to the children's prior adjudication as neglected on 7 February 2017. As respondent-mother states in her brief, "[t]he children were removed from the custody of their parents primarily due to the father's alcohol abuse and improper discipline. The trial court also noticed issues with the cleanliness of the home." The court also made findings detailing the causes of Chaz's failed trial home placement with respondent-mother in the spring of 2017.[2]

Respondent-mother argues that, given the progress she and respondent-father had made at the time of the termination hearing, the evidence and the trial court's findings of fact do not support the court's conclusion that Justin and Billy were likely

---

[2] Respondent-mother objects to the trial court's reliance on Chaz's 2017 trial home placement as evidence that she is likely to neglect the children in the future. In the two years since the trial placement, she avers, respondent-father returned to live with her, and they "completed two parenting classes, engaged in therapy, and had maintained a clean and substance free home for an extended period time." However, the trial court was free to consider the results of a prior trial home placement in determining whether, *at the time of the termination hearing*, respondent-mother was likely to subject the children to future neglect. *See In re Ballard*, 311 N.C. 708, 716 (1984) ("[T]he trial court must admit and consider all evidence of relevant circumstances or events which existed or occurred *either before or after* the prior adjudication of neglect.").

to experience further neglect if they were returned to her custody. *See generally In re Z.V.A.*, 373 N.C. 207, 212 (2019) (requiring court to "consider evidence of changed circumstances occurring between the period of past neglect and the time of the termination hearing"). She contends the trial court "relied heavily on circumstances that no longer existed at the time of the [termination] hearing." We disagree.

The trial court made the following additional findings of fact which support its conclusion that "there is a high likelihood of repeated neglect if the juveniles were returned to [respondent-mother]":

> 16.   . . .
>
> (A) . . .
>
> i.   [Respondent-mother] has been ordered not to discuss this case with the juveniles. . . . She has continued to discuss the case with the juveniles, making them promises about the outcome of the case and telling them what to say to providers and to DSS workers. This has impeded the juveniles['] ability to make emotional progress in their current placement.
>
> ii.   The juveniles have been led to believe that things will get better. They have been told that they would not have to do anything because she would get them back.
>
> . . . .
>
> vii.   [Respondent-mother] has failed to understand the impact of her actions or inactions, has had on her children. She fails to understand the importance of maintaining a safe, clean environment for the juveniles.

(B) . . .

i. [Respondent-mother] has not gained insight into the effects of [respondent-]father's severe alcohol abuse and physical abuse on the children . . . . She minimizes [respondent-]father's actions and makes excuses for his behavior.

ii. [Respondent-mother] . . . cannot stand without assistance for more than 15 minutes and has difficulty completing basic household tasks. She continues to reside with [respondent-father], who does not help or assist her with the housework.

iii. [Respondent-mother] is in need of counseling for anxiety and depression, in part due to sexual abuse of her as a child and young adult, but she does not believe she needs counseling and will not continue counseling.

17. . . .

(A) . . .

. . . .

iv. [Respondent-father] admits to drinking alcohol since age 9, sometimes as many as 24 beers per day, but he does not believe he needs to permanently stop drinking and has not showed insight into his drinking problem after undertaking some treatment through Daymark Recovery Services.

(B) . . .

i. [Respondent-father] has failed to understand [the] impact that improper discipline has on the juveniles, and he has not acknowledged that his discipline was improper, therefore making it likely that he would exercise improper discipline again in the future.

ii.   [Respondent-father] says that he has corrected his alcohol use. However, he acknowledges he may drink again at some point in the future.

iii.  [Respondent-father] will not complete therapy to address his issues of abandonment, as well as his lack of insight into his own substance abuse issues.

To the extent respondent-mother does not contest these findings, they are binding on appeal. *Koufman v. Koufman*, 330 N.C. 93, 97 (1991).

Respondent-mother challenges the portion of Finding of Fact 16(A)(i) which states her ongoing discussions of the case with the children "impeded the[ir] ability to make emotional progress in their current placement." She acknowledges that, "[a]t some point after the adjudication, [she] was ordered not to discuss the case with her children" and that she "should have refrained from making the comments to her children[.]" However, she insists DSS adduced no evidence that her statements "prevented the children from making emotional progress."

In its initial "Adjudication and Disposition Order" entered in February 2017 and in subsequent review orders, the trial court ordered respondent-mother not to "discuss the case with the juveniles at any time" or "under any circumstances." The DSS social workers who observed respondent-mother's visitations with the children testified respondent-mother routinely flouted this prohibition as reflected in Finding of Facts 16(A)(i)–(ii). Respondent-mother's inappropriate comments to the children were an ongoing problem throughout the case up to the time of the termination hearing.

As for the effect of these comments on the children, a social worker testified that Chaz had "a hard time" and became disruptive in his foster placement after respondent-mother falsely assured him, "'You're coming home. Don't worry about it. They can't keep you that long[.]" More recently, respondent-mother had told Billy "she can get the kids back in the snap of a finger," leaving him to wonder why he remained in foster care if his mother "could change the judge's mind with the snap of a finger[.]" Both social workers testified that this type of statement to the children "gets their hopes up" by creating unrealistic expectations and promising outcomes respondent-mother cannot deliver. We find this evidence sufficient to support an inference that the children's emotional progress was at least "impeded" by respondent-mother's actions.

Respondent-mother next objects to Finding of Fact 16(A)(vii) and claims the evidence showed she had come to understand, at the time of the termination hearing, both "the importance of maintaining a clean and safe home for her children" and "how her own actions negatively affected the children."

To the extent respondent-mother's objection concerns her willingness to maintain a clean home, we agree the trial court's finding does not account for her improvement in this area. Respondent-mother acknowledged the home had fallen into "disarray" after her back surgery in 2015 and was "a mess" when the children were removed by DSS in November 2016. However, she testified that she and respondent-father had cleaned up the house after he returned in 2017 with the

assistance of the DSS social worker and a "Medicaid nurse" who comes to the residence ten hours per week to assist with cleaning. Respondent-mother introduced photographs of the home taken on the morning of 28 February 2019, depicting "how the house looks now[.]"

The DSS social worker largely corroborated respondent-mother's account of the improvement made to conditions in the state of the home between 2017 and the social worker's final visit to the residence in March 2018. Absent any proffer of evidence contradicting respondent-mother's evidence of her ongoing maintenance of a clean home up to the time of the termination hearing, we deem this portion of Finding of Fact 16(A)(vii) to be unsupported by the record. Therefore, we disregard the finding for purposes of our review. *In re J.M.J.-J.*, 374 N.C. 553, 559 (2020); *In re J.M.*, 373 N.C. 352, 358 (2020).

The remainder of Finding of Fact 16(A)(vii) is amply supported by the evidence, including respondent-mother's own testimony. Despite her completion of two sets of parenting classes in February and May of 2017, respondent-mother continued to exhibit a lack of understanding of her responsibility to ensure a safe home environment for her children. DSS introduced a psychological evaluation of respondent-mother prepared by Dr. George Popper in November 2017. Dr. Popper described respondent-mother's "insight as to the impact of substance abuse and physical discipline . . . on her children" as "inconsistent." By the time of the termination hearing, respondent-mother no longer accepted that the children were

neglected at the time of their removal in November 2016. She denied respondent-father had been intoxicated when he "backhanded" Chaz in the mouth and accused the child of exaggerating the incident and of biting his own mouth on the school bus the following morning in order to draw blood and "make some stuff happen." Respondent-mother also denied respondent-father's alcohol use had caused a disruption in the home and suggested his drinking was "[n]ot necessarily . . . a problem with [the] children being in the home" because respondent-father "was not staggering around falling down drunk."

The evidence also supports the trial court's finding that respondent-mother fails to understand the impact of her actions and inactions on the children. In addition to her failure to recognize how her inappropriate statements affected the children, the evidence showed respondent-mother engaged in inappropriately sexualized contact with the children during visitations, requiring ongoing correction by DSS staff or respondent-father. Moreover, in her hearing testimony, respondent-mother repeatedly disavowed any duty to protect her children from respondent-father's substance abuse, anger issues, or physical disciplining, insisting that she "cannot do nothing about it" and "cannot force [respondent-father] to do anything." We find that respondent-mother's argument as to Finding of Fact 16(A)(vii) lacks merit.

Respondent-mother next challenges the evidentiary support for Finding of Fact 16(B)(i), which states she "has not gained insight into the effects of [respondent-father's] severe alcohol abuse and physical abuse on the children" and

"minimizes . . . and makes excuses for his behavior." The evidence, however, supports this finding. Respondent-mother devoted a substantial portion of her hearing testimony to denying that the children had been neglected, downplaying the degree of respondent-father's alcohol consumption, and insisting that the physical discipline respondent-father inflicted on Chaz was entirely appropriate, or at least understandable. Respondent-mother refused to believe respondent-father's own account of his alcohol consumption and claimed to be unaware of any occasion when he had hit the children while drinking. In additional to accurately reflecting respondent-mother's testimony, Finding of Fact 16(B)(i) is supported by Dr. Popper's findings regarding respondent-mother's tendency to defend respondent-father and "minimize his physical abuse of [Chaz]." Respondent-mother's argument lacks merit.

To the extent respondent-mother separately contends that the evidence showed her and respondent-father's mutual "acknowledgment of the importance of maintaining a sober household and refraining from physical discipline," we again find her position without merit.

The evidence did show respondent-father's completion of the Moderate Level Substance Abuse Treatment Program at Daymark Recovery Services in October 2018.[3] On the date of his graduation from Daymark, however, he announced to his group, "My medications allow me to drink beer not liquor. [Respondent-mother] will

---

[3] Respondent-father also completed Daymark's Substance Abuse Intensive Outpatient Treatment Program in February 2017.

only be mad if it's liquors. I can't say that I won[']t have another drink but it won't be every day."

By respondent-father's own account, he began drinking alcohol at nine years of age and had continued until November 2017 at age 62. He had completed several previous courses of treatment for alcohol abuse, including inpatient treatment at Black Mountain in 1976 which led to a years-long period of sobriety. Respondent-father then resumed drinking and accumulated multiple convictions for impaired driving. Respondent-father also previously attended outpatient treatment at Daymark in 2012.

More recently, respondent-father claimed to have quit drinking alcohol for a three-year period after hitting respondent-mother and then promising her that he "wouldn't drink anymore."[4] He testified he had resumed drinking after this interval because he "wanted a beer" and "she didn't care if [he] drank beer, just don't drink no liquor." Respondent-father claimed respondent-mother objected to him drinking liquor "simply because she knows [he is] not supposed to be drinking it with [his heart] medicine."

Although respondent-father testified he had not drunk alcohol since November 2017, he refused to acknowledge his alcoholism or commit to refrain from drinking alcohol:

---

[4] According to respondent-mother, respondent-father had been arrested for hitting her in "[p]robably 2003."

Q. Okay. You have been told you're an alcoholic, haven't you?

A. Does that make me an alcoholic?

. . . .

Q. But you don't believe you are?

A. I like beer.

Q. You're not gonna – you might drink again, right?

A. Well, they ain't gonna quit making it, but I might not quit – might not start back drinking either.

Q. Okay.

A. But there is always that possibility.

. . . .

Q. . . . But you don't admit you're an alcoholic?

A. Well, my – I don't admit that I'm retarded either, but I don't see the point in discussing it.

Q. And you believe you're powerless over alcohol?

A. No.

Respondent-father also insisted that his physical discipline of Chaz was an appropriate response to the child's conduct. He did not commit to refraining from similar discipline in the future. Moreover, respondent-father refused to follow Dr. Popper's recommendation to obtain treatment for his anger issues, believing he did not "have anger issues."

Contrary to her assertion on appeal, respondent-mother did not commit to maintaining a household free from alcohol abuse or physical discipline. She took the position that she was accountable only for her own actions and was powerless to exert any control over respondent-father or "force him to do anything." Asked if she had ever threatened to leave respondent-father if he continued to drink alcohol, respondent-mother replied, "No, not really. I told him that – I have told him straight out that, if he's gonna drink liquor, that I'm not gonna be with him, and I'm – that's the truth, I'm not, because I can't deal with it no more." As respondent-father's beverage of choice was beer, respondent-mother's ultimatum did not in any way amount to a demand for his sobriety. Her objection to Finding of Fact 16(B)(i) on this basis is unfounded.

Respondent-mother also claims the trial court erred in basing its adjudication in part on Finding of Fact 16(B)(iii), which notes her refusal to pursue counseling recommended by Dr. Popper to address the sexual abuse and other trauma she experienced as a child. While acknowledging "it is not unreasonable for the trial court to want [her] to address her underlying childhood traumas,"[5] respondent-mother

---

[5] Insofar as respondent-mother's argument may also be construed to challenge the evidentiary support for the finding that she "does not believe she needs counseling and will not continue counseling," we find her claim refuted by her own testimony as well as the testimony of the DSS social worker. Respondent-mother's argument that an unwillingness to discuss her childhood trauma with a therapist "is not the same as her unwillingness to go [to therapy]" lacks merit. And although respondent-mother offered to resume therapy on the date of the termination hearing, nearly two-and-a-half years into the case, the trial court was free to find her offer neither timely nor credible. *See In re D.L.W.*, 368 N.C. 835, 843 (2016).

contends "DSS failed to provide a nexus between [her] past trauma and how it [sic] neglected her children."

The evidence showed Dr. Popper recommended counseling for respondent-mother "to deal with the emotional trauma she suffered as a child[.]"He found respondent-mother's "parenting role models were obviously quite poor," and "the trauma she experienced growing up has had a lasting impact on her ability to care for herself and for her children." Dr. Popper deemed it likely that the emotional abuse respondent-mother suffered at the hands of her alcoholic mother and the sexual abuse inflicted by her brothers and uncle made her less equipped to assert herself against potential abusers in order to protect her children. Dr. Popper expressed his "concern that [respondent-mother] could be intimidated by a potential abuser" and recommended "this [a]s one of the issues that she should address in counseling."

The nexus between respondent-mother's unresolved childhood trauma and her ability to provide her children with proper care and supervision and a safe environment was laid bare by respondent-mother's hearing testimony. Asked about her reaction to respondent-father's alcohol use in the home, respondent-mother described how she would "shut down" to protect herself, as follows:

> My momma was an alcoholic. After so many drinks, she started hitting, and I had to shield myself, and it was my problem. And every time I seen [respondent-father] drink, after the third beer, I shielded myself. I kept myself in a little box for I cannot get hurt. And I kept the boys – I said, "Okay" – I even made them aware of it. "Do not make anybody mad when they are drinking," because of my past,

> and I recently got over my past of that, because when you live with an alcoholic or raised by an alcoholic, it is hard. You got to know the boundaries. And I – after three beers – I know he wasn't gonna hurt me or anything, but from my past, I automatically shield myself.

Respondent-mother also voiced her helplessness to resolve respondent-father's "anger management problem," explaining she had learned to "back off" when she saw he was getting upset. She also seemed to justify respondent-father backhanding Chaz in the mouth in September 2016 by noting, "If I done that to my daddy, he would have done the same thing to me." Because respondent-mother's testimony vindicates each of Dr. Popper's concerns about her need for treatment to address the impact of her childhood trauma, the trial court did not err in citing this issue as a factor tending to show a likelihood of future neglect.

Having reviewed each of the contested findings of fact, we now turn to respondent-mother's claim that the trial court's findings do not support its conclusion that "there is a high likelihood of repeated neglect if the [children] were returned to her" care. *See generally In re J.O.D.*, 374 N.C. 797, 807 (2020) ("[T]he trial court's determination that neglect is likely to reoccur if [the juvenile] was returned to [the respondent-parent's] care is more properly classified as a conclusion of law."). Respondent-mother asserts the trial court improperly based its conclusion on "circumstances that no longer existed at the time of the [termination] hearing." We disagree.

As the trial court found, when given an opportunity to parent Chaz without respondent-father in the home, respondent-mother was unable to administer his medication or otherwise care for him properly. More significantly, although she had made progress regarding the cleanliness of her residence and had completed parenting classes, respondent-mother had not resolved the primary risk posed to the children—that of respondent-father's continued presence in the home. *See In re Z.V.A.*, 373 N.C. 207, 212 (2019) ("The district court's determination in the present case that neglect would likely be repeated if [the child] was returned to respondent-father was intrinsically linked to respondent-father's inability to sever his relationship with respondent-mother."); *see also In re A.R.A.*, 373 N.C. 190, 198 (2019) ("Respondent-mother's argument disregards the primary reason for the removal of her children—the presence of the father in the home.").

As he had multiple times in the past, respondent-father had completed a course of substance abuse treatment at the time of the termination hearing and claimed to have abstained from alcohol since November 2017. However, he continued to deny his alcoholism and felt at liberty to resume drinking beer provided he abstained from liquor. Respondent-father had failed to recognize or obtain treatment for his anger problem and refused to acknowledge using inappropriate physical discipline on Chaz. He testified that DSS had taken the children into custody because the social worker "just wanted to show [him] she had the power to do what she said she could do."

At the time of the termination hearing, respondent-mother denied the children had ever experienced neglect or inappropriate discipline in the home and disclaimed any responsibility for respondent-father's alcohol abuse or disciplinary methods. She had further failed to address the psychological issues identified by Dr. Popper which prevented her from recognizing the harm caused to the children by respondent-father's behaviors and from taking the necessary steps to provide the children with a safe home. Therefore, we hold the trial court did not err in adjudicating grounds for termination of her parental rights for neglect under N.C.G.S. § 7B-1111(a)(1).

Because we affirm the trial court's adjudication of neglect, we do not review respondent-mother's arguments regarding the additional grounds for termination found by the trial court. *In re E.H.P.*, 372 N.C. at 395. Respondent-mother does not separately contest the court's dispositional determination that terminating her parental rights is in Justin and Billy's best interests. Accordingly, we affirm the trial court's orders as to respondent-mother.

### III. Respondent-Father's Appeal

Respondent-father does not challenge the trial court's adjudication of grounds to terminate his parental rights under N.C.G.S. § 7B-1111(a). Rather, he argues that the trial court abused its discretion at the dispositional stage of the proceeding by concluding it was in Billy's best interests to terminate respondents' parental rights, thereby "ignoring Billy's expressed wishes not to be adopted[.]"

If the trial court adjudicates the existence of one or more grounds for the termination of parental rights, it must then "determine whether terminating the parent's rights is in the juvenile's best interest" after considering the following factors:

>(1) The age of the juvenile.
>
>(2) The likelihood of adoption of the juvenile.
>
>(3) Whether the termination of parental rights will aid in the accomplishment of the permanent plan for the juvenile.
>
>(4) The bond between the juvenile and the parent.
>
>(5) The quality of the relationship between the juvenile and the proposed adoptive parent, guardian, custodian, or other permanent placement.
>
>(6) Any relevant consideration.

N.C.G.S. § 7B-1110(a) (2019). "The trial court's dispositional findings are binding . . . if they are supported by any competent evidence" or if not specifically contested on appeal. *In re E.F.*, 375 N.C. 88, 91 (2020).

We review the trial court's determination of a juvenile's best interests under N.C.G.S. § 7B-1110(a) only for abuse of discretion. *Id.* "Under this standard, we defer to the trial court's decision unless it is 'manifestly unsupported by reason or one so arbitrary that it could not have been the result of a reasoned decision.' " *In re J.J.B.*, 374 N.C. at 791 (quoting *In re Z.A.M.*, 374 N.C. 88, 100 (2020)). A trial court may also

abuse its discretion if it "misapprehends the applicable law," *Chappell v. N.C. Dep't of Transp.*, 374 N.C. 273, 281 (2020), or fails to comply with a statutory mandate, *Harris v. Harris*, 91 N.C. App. 699, 705–06 (1988).

Our adoption statutes require the child's consent to an adoption if he is at least twelve years of age. N.C.G.S. § 48-3-601(1) (2019). Under N.C.G.S. § 48-3-603(b)(2) (2019), however, the trial court is authorized to "issue an order dispensing with the [child's] consent . . . upon a finding that it is not in the best interest of the [child] to require the consent."

The trial court made the following findings of fact regarding the dispositional factors in N.C.G.S. § 7B-1110(a):

> (A)   . . . [Billy] is 15-years old. He will not reach the age of majority for three years. The undersigned [j]udge has determined that he does not need [Billy's] consent for adoption based on the evidence and testimony heard throughout the case.
>
> (B)   . . . [L]ikelihood of adoption for [Billy] is high.
>
> (C)   . . . Termination of Parental Rights would aid in accomplishing the permanent plan for [Billy] which is adoption.
>
> (D)   . . . [Billy] has somewhat of a bond with his mother but is afraid of his father. [Billy's] only reason to return home would be to protect his younger brother, [Justin] from [respondent-father] and [Chaz]. [Billy] feels as he is one of the parents in regard to [Justin]. This does not constitute a positive bond between [Billy] and his parents. [Billy] is afraid of returning home.

(E)     [Billy] has an interesting character of wanting to cure his father and take care of his brother, [Justin]. [Billy] needs to discuss with his therapist what he believes his relationship with his family is.

(F)     . . . [Billy] has a good relationship with his current placement. His current placement wants to adopt him, although they recognize he may not want to be adopted. [Billy's] current placement providers have taken good care of him. [Billy's] foster parents are sensitive to his wishes and concerns regarding his relationship with his parents. They are willing to provide a permanent home for him and he wants to stay in his current home on a permanent basis.

(G)     Other relevant considerations:

1)  It has been discussed with [Billy] the difference between adoption and guardianship. [He] reports that he understands some aspects between the two.

2)  Based on the evidence and testimony heard throughout this case, pursuant to NCGS 48-3-603(b)(2), it is not in [Billy's] best interest for his consent to be required for adoption.

The court separately concluded it was in Billy's best interests that the parental rights of respondent-mother and respondent-father be terminated.

We begin by addressing respondent-father's claim that the trial court "fail[ed] to safeguard [Billy's] statutory due process rights" by providing Billy with notice of the dispositional hearing and affording him the opportunity to attend the hearing and testify on his own behalf, independent of his court-appointed guardian *ad litem*

(GAL).[6] Assuming arguendo that respondent-father has standing to assert Billy's procedural rights on appeal, we conclude he has failed to preserve this issue for our review.

Under the North Carolina Rules of Appellate Procedure, "[i]n order to preserve an issue for appellate review, a party must have presented to the trial court a timely request, objection, or motion, stating the specific grounds for the ruling the party desired the court to make if the specific grounds were not apparent." N.C. R. App. P. 10(a)(1). In this case, neither respondent-father nor any other party presented the trial court with the argument that Billy had the right to notice and to appear and testify at the dispositional hearing under N.C.G.S. § 7B-1110(a). Therefore, this issue was not preserved for appeal. *See In re E.D.*, 372 N.C. 111, 116 (2019).

We recognize that "[w]hen a trial court acts contrary to a statutory mandate, the defendant's right to appeal is preserved despite the defendant's failure to object during trial." *State v. Braxton*, 352 N.C. 158, 177 (2000) (quoting *State v. Lawrence*, 352 N.C. 1, 13 (2000)). However, while characterizing his claim as sounding in "statutory due process,"[7] respondent-father concedes there is no explicit statutory

---

[6] Respondent-father also asks this Court to "consider" requiring the appointment of counsel to represent the personal preferences of older juveniles, separate from the GAL attorney advocate who advances the juvenile's best interests. Because we conclude respondent-father failed to preserve these issues for appellate review under N.C. R. App. P. 10(a)(1), we decline to consider this issue.

[7] Respondent-father did not raise any issue of constitutional due process in the trial court and thus may not raise such a claim for the first time on appeal. *See State v. Gainey*, 355 N.C. 73, 87 (2002).

grant of the procedural rights he would provide to Billy. The absence of clear statutory language directed to the trial court compels our conclusion that respondent-father was required to comply with Rule 10(a)(1) in order to raise this claim on appeal. *See In re E.D.*, 372 N.C. at 117 ("When a statute 'is clearly mandatory, and its mandate is directed to the trial court,' the statute automatically preserves statutory violations as issues for appellate review." (quoting *State v. Hucks*, 323 N.C. 574, 579 (1988)).

As respondent-father observes, the statutes governing juvenile abuse, neglect, and dependency proceedings provide certain procedural rights to juveniles who are at least twelve years old in addition to the general right to representation by a GAL under N.C.G.S. § 7B-601(a) (2019).[8] Section 7B-906.1, for example, requires the clerk of court to provide older juveniles with fifteen days' notice of all permanency planning hearings; it also requires the court to "consider information from . . . the juvenile"[9] in addition to the juvenile's parents, caretaker, and GAL in determining "the needs of the juvenile and the most appropriate disposition." N.C.G.S. § 7B-960.1(b)–(c) (2019). Similarly, juveniles twelve years of age or older are entitled to written notice of hearings to review a voluntary foster care placement under N.C.G.S. § 7B-910(d)

---

[8] Though not cited by respondent-father, N.C.G.S. § 7B-1108(b)–(d) (2019) governs the appointment of a GAL to represent a juvenile in a termination of parental rights proceeding.

[9] The statute governing the initial dispositional hearing in an abuse, neglect, or dependency proceeding also provides "[t]he juvenile" with "the right to present evidence, and . . . [to] advise the court concerning the disposition[.]" N.C.G.S. § 7B-901(a) (2019). Unlike N.C.G.S. § 7B-906.1(c), however, the statute does not expressly distinguish the juvenile from the GAL. *Id.*

(2019), and all post-termination placement reviews under N.C.G.S. § 7B-908(b)(1) (2019).

Conspicuously absent from N.C.G.S. § 7B-1110—the statute governing the dispositional hearing in a termination of parental rights case—is any equivalent language providing juveniles of any age with the right to notice or the right to attend and testify at the hearing. *See* N.C.G.S. § 7B-1110(a); *see also* N.C.G.S. §§ 7B-1106(a)-(a1), -1106.1(a) (2019) (addressing service of process or notice of a petition to terminate parental rights or a motion to terminate parental rights filed in a pending abuse, neglect, or dependency proceeding). Moreover, § 7B-1110 *does* expressly provide juveniles twelve years of age or older with the right to be served with a copy of the order terminating their parent's rights. N.C.G.S. § 7B-1110(d) (2019). Our General Assembly has thus demonstrated its ability to codify special protections for older juveniles in the termination of parental rights statutes when it intends to do so.

Faced with the absence of favorable statutory language, respondent-father infers from other sections of the Juvenile Code the General Assembly's "clear preference that the express wishes of older juveniles be communicated directly to the trial court[,]" rather than through intermediaries such as the GAL. For purposes of issue preservation under Rule 10(a)(1), it suffices to say that an unarticulated legislative "preference" is not a clear statutory mandate directed to the trial court. *See generally In re E.D.*, 372 N.C. at 117 (limiting the statutory mandate exception to Rule 10(a)(1)). Accordingly, we hold respondent-father failed to preserve for appeal

his arguments regarding Billy's right to participate in the dispositional hearing under N.C.G.S. § 7B-1110(a).

Respondent-father also claims the trial court abused its discretion by "ignoring Billy's expressed wishes not to be adopted and by finding that his consent should be waived based on evidence that was neither relevant nor reliable." We find no merit to this assertion.

The trial court received evidence from both DSS and the GAL that Billy had no desire to return to respondents' home and wished to remain permanently with his current foster parents, with whom he had resided since December 2016. The social worker and GAL both testified that Billy had expressed a preference for a guardianship arrangement with his current foster parents rather than adoption "because of loyalty to his family" and a concern that, "if he's adopted, the bond [with his family] might be threatened[.]" Both witnesses emphasized the number of conversations they had with Billy about the differences between guardianship and adoption, as well as the difficulty Billy experienced in trying to understand the differences.

The trial court's findings accurately reflect the evidence on Billy's position with regard to being adopted by his foster parents. Furthermore, by finding that it was not in Billy's best interests to require his consent to adoption, and by citing the applicable adoption statute, N.C.G.S. § 48-3-603(b)(2), the court demonstrated its

consideration of Billy's stated preference for guardianship in lieu of adoption.[10]

Although respondent-father contends the court did not give "proper weight" to Billy's preference, the weight assigned to particular evidence, and to the various dispositional factors in N.C.G.S. § 7B-1110(a), is the sole province of the trier of fact.[11] *See In re A.J.T.*, 374 N.C. 504, 514 (2020) ("Respondents essentially ask this Court to do something it lacks the authority to do—to reweigh the evidence and reach a different conclusion than the trial court.").

Respondent-father also claims the trial court "abused its discretion when it found the likelihood of adoption was high and that termination of parental rights would aid in the adoption." Rather than challenge the evidentiary support for these findings, respondent-father reiterates the point that Billy's adoption would require the trial court to disregard Billy's stated wishes and waive the consent requirement pursuant to N.C.G.S. § 48-3-603(b)(2). On their face, however, these findings evince the court's full awareness of the legal implications of Billy's opposition to being adopted and the court's determination that it was contrary to Billy's best interests to

---

[10] Although respondent-father does not challenge the trial court's finding on this basis, we note the finding was not made in the context of a pending adoption proceeding under Chapter 48 and is not binding in any future action for Billy's adoption.

[11] Respondent-father also asserts the trial court "ignored all the evidence from the social worker and GAL that Billy clearly understood the difference between adoption and guardianship." However, the social worker testified that Billy had stated his preference for guardianship, "but he's also says [sic] he really doesn't understand the difference." Moreover, the trial court's findings credit Billy with understanding "some aspects" of the distinction between guardianship and adoption. Because these findings are supported by competent evidence, they are binding. *In re E.F.*, 375 N.C. at 91.

require his consent to adoption. Given the waiver mechanism in N.C.G.S. § 48-3-603(b)(2), the evidence fully supports a finding that Billy is likely to be adopted. As a matter of law, the termination of respondents' parental rights would further that goal.

Having considered each of respondent-father's arguments, we hold the trial court did not abuse its discretion in concluding it was in Billy's best interests to terminate respondent-father's parental rights. The court's findings address each of the dispositional factors in N.C.G.S. § 7B-1110(a) and support its ultimate determination that adoption will provide Billy with the most stable and enduring permanent plan of care. *See* N.C.G.S. § 7B-1100(2) (2019). Accordingly, we affirm the termination orders as to respondent-father.

AFFIRMED.